## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA


FREDERICK MUTUAL INSURANCE CO.    :
                                  :
             Plaintiff            : CIVIL ACTION
                                  :
         vs.                      :
                                  :
DONALD HALL, Individually         : NO. 15-CV-3354
and trading as HALLSTONE, INC.    :
and MARIE A. HALL, Individually   :
and trading as HALLSTONE, INC.    :
and HALLSTONE, INC. and           :
R. LEE HULKO and BRADLEY B. FAIR  :
                                  :
             Defendants           :


## DECISION


**JOYNER, J.**                              **October 26, 2017**


     This civil action for declaratory judgment was tried non-
jury before the undersigned on April 24, 2017.  The parties have
filed their proposed factual findings, legal conclusions and
briefing and the matter is now ripe for adjudication.  We
therefore now make the following:

### FINDINGS OF FACT

     1.  Plaintiff, Frederick Mutual Insurance Company is a duly
authorized and licensed Maryland insurance company which
maintains its principal place of business at 57 Thomas Johnson
Drive, Frederick, Maryland 21702.

     2.  Defendants Donald Hall and Marie A. Hall are adult

individuals, husband and wife who reside at 723 Telegraph Road, Perkasie, Bucks County, Pennsylvania 18944 and who regularly conduct business and/or trade as Hallstone, Inc.

3.   Defendant Hallstone, Inc. is a business entity of unknown type with a principal place of business at 723 Telegraph Road, Perkasie, Bucks County, Pennsylvania, 18944.

4.   The primary business of Hallstone and Donald Hall is stone masonry contracting.

5.   Frederick Mutual Insurance Co. is, and at all times relevant to this action was, licensed and/or authorized to sell insurance in Pennsylvania.

6.   Defendants R. Lee Hulko and Bradley B. Fair are adult individuals who reside at 4310 Tollgate Road, New Hope, Bucks County, Pennsylvania 18938.

7.   Beginning in or around March 2006, Defendants Hulko and Fair contracted with Defendants Hallstone and/or Donald Hall for the performance of certain custom stone work to be done in conjunction with a number of improvements which they were making to their home and property on Tollgate Road.  Under the contract, "[a]ll material [was] guaranteed to be as specified and the above work [was] to be performed in accordance with the drawings and specifications submitted for the above work and completed in a substantial workmanlike manner".  By the time all of the stonework was completed in 2008, Hulko and Fair had paid

2

Hall/Hallstone nearly $300,000 for the work performed over a period of some three years.

8.   Sometime in 2005, Donald Hall had been told by a builder for whom he was working that he needed to obtain  "maximum coverage" in the aggregate amount of $1 million/$2 million.  In response, Mr. Hall contacted Andrew Rumbold at the Fraser Insurance Agency in Doylestown, PA and asked him for insurance in those amounts which would provide "soup to nuts" coverage.

9.   Mr. Rumbold submitted an application to and a down payment on Mr. Hall's behalf to Frederick Mutual and, in September 2005, Frederick Mutual wrote an "artisans" policy, Policy No. APP2050248, for Mr. Hall/Hallstone which purportedly provided coverage in the amounts requested and which remained in force for the period September 27, 2005 through September 27, 2006.

10.   In the 2005-2008 time frame, it was Frederick Mutual's policy to mail two copies of newly written/issued policies to the insurance agency – one for the insured and one for the agent with the expectation that it was the responsibility of the agent to review the policy with the insured and either hand deliver or mail the insured their copy.  Thereafter, all billing and subsequent communications, such as policy renewal materials, were to be sent directly from Frederick Mutual to the insured.  In this case, there is no evidence that Frederick Mutual ever mailed

a full copy of the policy to the Fraser Agency or directly to Mr. Hall t/a Hallstone, Inc.  Rather, the only thing received by the Fraser Agency and/or Mr. Hall/Hallstone was a copy of the declarations sheet showing what the coverages were.

11.  At the conclusion of the one-year policy term, Hallstone did not renew the existing policy.  However, beginning on or about August 1, 2007, Frederick Mutual did issue another policy to Hallstone, identical to the one which was in force for the September, 2005 - September, 2006 time frame, which remained in place until February, 2008 when it was cancelled for non-payment of premium.

12.  The Fraser Agency is an independent insurance agency and as such can and will place insurance with any of the insurance companies for whom it is approved and/or with whom it has a relationship.  Although by contract it represents and is an agent for the insurance companies, as an independent agency it can "shop" insurance for customers who come to it seeking the best rate for the most or specific coverage.  According to the Fraser Agency's website:

> As your independent insurance agent, we truly represent you, the insured, and not just the insurance companies. ... We put the best interests of our clients first from recommending coverages to claims counseling."

13.  As was the case with most of the contractors who approached Mr. Rumbold seeking to obtain insurance, Mr. Hall did not make any specific requests for coverage, aside from stating

his desire for "soup to nuts" coverage and did not ask any questions about exactly what would be covered under his policy with Frederick Mutual. Mr. Rumbold did not have any substantive discussions with Mr. Hall about what was and/or was not covered under the policy at issue and at no time did Mr. Rumbold sit down with Mr. Hall and explain the policy to him.

14. Contrary to Frederick Mutual's purported policies and procedures, the Fraser Agency never received copies of the Frederick Mutual policies which were issued to Hallstone. Rather, it received only copies of the declarations page.

15. The Fraser Agency never either mailed or hand-delivered a copy of the Hallstone policies to Mr. Hall nor did Mr. Rumbold ever sit down to review or explain what was or was not covered to Mr. Hall. Likewise, Mr. Hall never asked any questions or sought any information about what the Frederick Mutual policy(ies) did or did not cover.

16. It was Mr. Hall's belief that "if something was done inadvertently," or if his business did something and someone made a claim against his business that he might be liable for, he would be covered for it.

17. Mr. Hall recalls only receiving a declarations sheet ("dec sheet") showing the type and amount of coverage from Frederick Mutual. While Mr. Hall never received a copy of the full policy from either the Fraser Agency or in the mail from

Frederick Mutual, Mr. Rumbold never received any complaint or request from Mr. Hall that he hadn't received a copy of his policy and there is no evidence that Mr. Hall ever sought a full copy or complained to anyone about his not having received one.

18. The "dec sheet" issued on Policy No. APP2050248 consisted of two pages at the top of which was the title **"ARTISANS DECLARATIONS"** and name and address of the Frederick Mutual Insurance Company and the additional notations that it was **FORM: PA - Artisans** and "Direct Bill - insured, PA - Annual." The Insured was listed as "Hallstone Inc., 723 Telegraph Road, Perkasie, PA 18944" and the Agency 510, "Fraser Diversified, Inc., t/a R.A. Fraser Agency 33 Union Street, Suite #3, Doylestown, PA 18901, (215) 340-1888. The following language appeared on the first page:

> **In return for the payment of the premium, and subject to all the terms of the policy, we agree to provide you with the insurance as stated in this policy.**
>
> **POLICY PERIOD: from 9/27/2005 to 9/27/2006, 12:01 AM standard time at the insured premises**
>
> **Form of Business: Corporation Type of Business-P10195 Masons**
>
> **The following forms and endorsements are made a part of this policy at time of issue.**
>
> AP-100 (Ed. 2.0) Contractors Special Policy
>
> AP-0335 (Ed. 11/01) Amendatory Endorsement - Pennsylvania
>
> ML-120 (Ed. 2.0) Insurance Consultation Services Exemption Act-Notice

GL-894 (Ed. 2.0) Punitive Damages Exclusion

AP-0690 (Ed. 6/02) Exclusion - Exterior Insulation and Finish Systems

AP-0689 (Ed. 6/02) Exclusion - Wet Rot, Dry Rot, Bacteria, Fungi, or Protists - Contracting Operations

AP-0643 (12 99) Known Injury or Damage Amendments

BP-336 (Ed. 1.0) Premium Payments

FMT (Ed. 2/03) Terrorist Disclosure Notice

GL-899 (Ed. 2.0) Cross Liability Exclusion

AP-0360 (Ed. 7/03) Limited Fungus and Related Perils Coverage

**Property Coverages**

**LOCATION:** Location Address: 723 Telegraph Road Perkasie, PA 18944 COUNTY: Bucks

Property Deductible Limit $250; Personal Property Off Premises Limit $0

**STRUCTURE:**   Non-Sprinklered Frame Protective Device - None

        COV A - Building    Limit $0 Premium $0
        COV B - Business Personal Property Limit $0 Premium $0
        COV C - Loss of Income Limit $0 Premium $0

VALUATION: Actual Cash Value - Building
           Actual Cash Value - Business Personal Property

Auto Increase - None

**STRUCTURE Endorsements:**

        **Total Structure Premium - $0**
        **Total Location Premium - $0**

19.  The Second Page of the Artisans Declarations contained

the following language:

**Commercial liability Coverages Apply to All Locations**

**COMMERCIAL LIABILITY COVERAGE**

Property Damage Liability Deductible      $250

General Aggregate Limit                  $2,000,000 per
                                         policy period

Products/Completed Work Aggregate Limit  $2,000,000 per
                                         policy period

Cov L - Bodily Injury/Property Damage    $1,000,000 per
                                         occurrence

Cov M - Medical Payments                 $5,000 per person

Cov N - Products/Completed Work          $1,000,000 per
                                         occurrence

Cov O - Fire Legal Liability             $50,000 per
                                         occurrence

Cov P - Personal/Advertising Injury      $1,000,000 per
                                         occurrence

Number of Employees                      FT- 2; PT - 0

Liability Premium:

**COMMERCIAL LIABILITY ENDORSEMENTS:**

    AP-222 Property Damage Liability Deductible

**POLICY ENDORSEMENTS:**

**IRPM**

IRPM 02- Classification Variation      13.00%      Debit

20.  The Frederick Mutual Policy at issue includes the following

relevant principal coverages, among others:

**COVERAGE L — BODILY INJURY LIABILITY/PROPERTY DAMAGE**

**LIABILITY**

"We" pay all sums which an "insured" becomes legally obligated to pay as "damages" due to "bodily injury" or "property damage" to which this insurance applies. The "bodily injury" or "property damage" must be caused by an "occurrence" which takes place in the "coverage territory," and the "bodily injury" or "property damage" must occur during the policy period.

   ...

**COVERAGE N - PRODUCTS/COMPLETED WORK**

"We" pay all sums which an "insured" becomes legally obligated to pay as "damages" due to "bodily injury" or "property damage" arising out of the "products/completed work hazard" to which this insurance applies. The "bodily injury" or "property damage" must be caused by an "occurrence" which takes place in the "coverage territory," and the "bodily injury" or "property damage" must occur during the policy period.

21. In addition, the Policy includes the following language among its supplemental coverages:

Subject to all the "terms" of the Principal Coverages, "we" provide the following supplemental coverages. They do not increase the "limits" stated for the Principal Coverages.

**CONTRACTUAL LIABILITY**

1. "We" cover "bodily injury" or "property damage" liability which is assumed under the following contracts or agreements:

   ...

   f. any part of any other contract or agreement relating to the conduct of "your" business (including an indemnification of a municipality in connection with work performed for a municipality) under which "you" assume tort liability to pay "damages" because of "bodily injury" or "property damage." Tort liability means a liability that would be imposed by law in the

absence of any contract or agreement.

22. The Definitions section of Frederick Mutual's Policy also sets forth the following relevant definitions:

...

3. "Bodily injury" means bodily harm, sickness, or disease sustained by a person and includes required care and loss of services. "Bodily injury" includes death that results from bodily harm, sickness, or disease. "Bodily injury" does not include mental or emotional injury, suffering, or distress that does not result from a physical injury.

4. "Coverage territory" means:

a. the "basic territory;"

b. international waters or airspace, only if the "bodily injury," "property damage," "personal injury," or "advertising injury" occurs in the course of travel to or from the "basic territory";

c. the world, if the injury or damage arises out of:

1) "products" "you" have made or sold in the "basic territory;" or

2) the activities of a person who normally resides in the "basic territory," but is away for a short time on "your" business; and

Provided that the "insured's" liability to pay "damages" has been determined in a suit on the merits in the "basic territory," or in a settlement that "we" have agreed to.

5. "Damages" means compensation in the form of "money" for a person who claims to have suffered an injury.

6. "Employee" includes a "leased worker." "Employee" does not include a "temporary worker."

7. "Impaired property" means tangible property (other than "products" or "your work"):

a. whose value has been decreased:

10

        1) because it includes "products" or "your work" that is, or is believed to be deficient or dangerous; or

        2) because "you" failed to carry out the terms of a contract; and

    b.   whose value can be restored:

        1) by the repair, replacement, adjustment, or removal of "products" or "your work;" or

        2) by "your" fulfilling the terms of the contract.

8.  "Insured" means:

    a.  "you" and "your" spouse, but only with respect to the conduct of a business of which "you" are the sole owner, if shown on the "declarations" as an individual;

    b.  "you" and all "your" partners or members and their spouses, but only with respect to the conduct of a business of which "you" are the sole owner, if shown on the "declarations" as an individual;

    c.  "you" and all "your" members and managers, but only while acting within the scope of their duties, if shown on the "declarations" as a limited liability company; and

    d.  "you" and all of "your" executive officers and directors, but only while acting within the scope of their duties, if shown on the "declarations" as an organization (other than a partnership, joint venture, or limited liability company).  It also includes "your" stockholders, but only for their liability as such.

"Insured" also includes:

    ...

    h.  "your" "employees," for acts within the scope of their employment by "you" (this does not include "your" managers if "you" are a limited liability company or "your" executive officers if "you" are an organization other than a limited liability company).  None of these "employees" are "insured" for:

1) "bodily injury," "personal injury," and "advertising injury" to "you" or to a fellow "employee; or

2) "property damage" to property owned by, rented to, or loaned to "employees," or any of "your" partners or members and their spouses (if "you" are a joint venture or a partnership), or any of "your" members (if "you" are a limited liability company).

...

11. "Occurrence" means an accident and includes repeated exposure to similar conditions.

12. "Personal injury" means injury (other than "bodily injury," "property damage," or "advertising injury") arising out of one or more of the following offenses:

a. oral or written publication of material:

1) that slanders or libels a person or organization;

2) that disparages a person's or an organization's goods, products, or services; or

3) that violates a person's right of privacy;

b. false arrest, detention, or imprisonment;

c. malicious prosecution; or

d. wrongful entry into, wrongful eviction from, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies. This offense must be committed by or on behalf of the owner, landlord, or lessor of the room, dwelling, or premises.

13. "Products/completed work hazard" -

a. "Products hazard" means "bodily injury" or "property damage" occurring away from premises "you" own or rent and arising out of "products" after physical possession of the "products" has been relinquished to others.

b. "Completed work hazard" means "bodily injury" or "property damage" occurring away from premises "you" own or rent and arising out of "your work."  It does not include work that has not been completed, or that has not been abandoned.

"Your work" is deemed completed at the earliest of the following times:

1) when all work specified in "your" contract has been done;

2) when all "your work" to be done at a job site has been completed if "your" contract includes work at more than one site; or

3) when "your work" at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same job site.

Work which requires further service, maintenance, correction, repair, or replacement because of defect or deficiency, but which is otherwise complete, shall be deemed completed.

...

14. "Products" means goods or products manufactured, sold, handled, distributed, or disposed of by "you," others trading under "your" name, or a person or organization whose business or assets "you" have acquired.

a. "Products" includes:

1) warranties or representations made at any time with respect to the fitness, quality, durability, or performance of "products;"

2) containers (other than vehicles), materials, parts, or equipment furnished in connection with such "products;" and

3) providing or failure to provide warnings or instructions.

b. "Products" does not include:

1) vending machines or other property that is rented to or placed for the use of others, but not sold; or

2) real property.

15. "Property damage" means:

a. physical injury or destruction of tangible property; or

b. the loss of use of tangible property whether or not it is physically damaged. Loss of use is deemed to occur at the time of the "occurrence" that caused it.

...

17. "Your work" means:

a. work or operations performed by "you" or on "your" behalf;

b. materials, parts and equipment supplied for such work or operations;

c. written warranties or representations made at any time regarding quality, fitness, durability, or performance of any of the foregoing; and

d. providing or failing to provide warnings or instructions.

23. In addition, the Frederick Mutual policy contains the following Exclusions:

"We" do not pay for a loss if one or more of the following excluded events apply to the loss, regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded event.

**EXCLUSIONS THAT APPLY TO BODILY INJURY, PROPERTY DAMAGE, PERSONAL INJURY, AND/OR ADVERTISING INJURY**

1. "We" do not pay for "bodily injury," "property damage," "personal injury," or "advertising injury" liability which

is assumed by the "insured" under a contract or an agreement.

This exclusion does not apply to:

    a. liability that an "insured" would have had in the absence of the contract or agreement; or

    b. "bodily injury" or "property damage" covered under Contractual Liability Coverage, provided that the "bodily injury" or "property damage" occurs after the effective date of the contract or agreement.

2. "We" do not pay for "bodily injury," "property damage," "personal injury" or "advertising injury" that arises out of the rendering or the failure to render a professional service, except as covered under Incidental Medical Malpractice Injury Coverage.

    . . .

9. "We" do not pay for "bodily injury" or "property damage" included within the "products/completed work hazard: except as covered under Coverage N.

    . . .

24. Finally and perhaps most significantly, the Policy also contains the following:

**ADDITIONAL EXCLUSIONS THAT APPLY ONLY TO PROPERTY DAMAGE**

1. "We" do not pay for "property damage" to property owned by, occupied by, or rented to "you," except as covered under Coverage O.

    . . .

5. "We" do not pay for "property damage" to that specific part of real property on which work is being performed by:

    a. "you;" or

    b. a contractor or subcontractor working directly or indirectly on "your" behalf,

    if the "property damage" arises out of such work. This

exclusion does not apply with respect to liability assumed under a sidetrack agreement.

6. "We" do not pay for "property damage" to that specific part of any property that must be restored, repaired, or replaced because of faults in "your work." This exclusion does not apply to:

   a. "property damage" covered under the "products/completed work hazard" or

   b. liability assumed under a sidetrack agreement.

7. "We" do not pay for "property damage" to "products" if the damage arises out of the "products" or their parts.

8. "We" do not pay for "property damage" to "your work" if the "property damage" arises out of "your work" and is included in the "products/completed work hazard." This exclusion does not apply if damage to the work or the part of the work out of which the damage arises is performed by a subcontractor on "your" behalf.

9. "We" do not pay for "property damage" to property that has not been physically injured or destroyed, or to "impaired property," that arises out of:

   a. a delay or failure to perform a contract by "you" or one acting on "your" behalf; or

   b. a defect, deficiency, inadequacy, or unsafe condition in "your work" or "products."

This exclusion does not apply to the loss of use of other property resulting from sudden and accidental physical injury to or destruction of "your work" or "products" after having been put to its intended use.

25. In April 2014, Defendants Hulko and Fair discovered that water and mold damage to the interior and structure of their residence necessitated the demolition, removal and replacement of the stone wall surrounding the exterior of the silo/stairwell and the rear flagstone terrace and the driveway stone walls, the re-

setting and repointing of the rear terrace walls, and repair of the chimney at a total cost of $352,294.

26.    Inasmuch as these repairs were required because of the alleged faulty workmanship on the part of Defendant Hallstone, on March 4, 2015, Messrs. Hulko and Fair commenced a civil action in the Court of Common Pleas of Bucks County, Pennsylvania against Donald and Marie Hall, trading as Hallstone.  That Complaint contained two counts alleging breach of warranty and violation of the Home Improvement Consumer Protection Act, 73 P.S. §517.1, *et. seq*.  Subsequently, that Complaint was amended twice, with the result that the Second Amended Complaint now alleges state law claims against the Halls/Hallstone for breach of warranty and negligence in the performance of the stonework.

27.    Although Frederick Mutual has provided defense counsel to the Halls/Hallstone to represent them in the Bucks County action, on June 15, 2015, it instituted this Declaratory Judgment action against all of these defendants seeking a declaration that it has no duty to defend or indemnify the Hallstone defendants under the terms of the policy at issue.

## DISCUSSION

"It is common practice for insureds and insurance companies to file declaratory judgment actions when there is a dispute regarding whether the insurer has a duty to defend and/or indemnify a policyholder making a claim under a policy."  Regis

Insurance Co. v. All American Rathskeller, Inc., 2009 PA Super 99, 976 A.2d 1157, 1161 (Pa. Super. Ct. 1999).  Indeed, the interpretation of an insurance contract is a question of law that is properly decided by the court.  Reliance Insurance Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)(citing Standard Venetian Blind Co. v. American Empire Ins. Co., 503 Pa. 300, 304-305, 469 A.2d 563, 566 (1983)).

To establish insurance coverage, the insured bears the initial burden of showing that the harm described in the plaintiff's complaint potentially falls within the scope of the policy.  Devcon International Corp. v. Reliance Insurance Co., 609 F.3d 214, 218 (3d Cir. 2010).  "If the complaint avers facts that might support recovery under the policy, coverage is triggered and the insurer has a duty to defend."  Id.(quoting Sikirica v. Nationwide Ins. Co., 416 F.3d 214, 225-226 (3d Cir. 2005)).  Thus, "[i]n determining the duty to defend, the complaint claiming damages must be compared to the policy and a determination made as to whether, if the allegations are sustained, the insurer would be required to pay the resulting judgment."  State Farm Fire & Casualty Co. v. Estate of Mehlman, 589 F.3d 105, 110 (3d Cir. 2009).  It should be noted that the duty to defend is broader than the duty to indemnify - if an insurer is found to not have a duty to defend, it will have no duty to indemnify.  Frog, Switch & Manufacturing Co. v. Travelers

Insurance Co., 193 F.3d 742, 746 (3d Cir. 1999); Travelers
Property Casualty Co. Of America v. Chubb Custom Insurance Co.,
864 F. Supp.2d 301, 313, n. 13 (E.D. Pa. 2012)(citing Kvaerner
Metals Div. Of Kvaerner U.S., Inc. v. Commercial Union Insurance
Co., 589 Pa. 317, 908 A.2d 888, 896 (2006)).

To determine whether based on its factual allegations an
underlying complaint triggers an insurer's duty to defend, a
court views the allegations as true and liberally construes them
in favor of the insured. Ramara, Inc. v. Westfield Insurance
Co., 814 F.3d 660, 673 (3d Cir. 2016). "A court's function when
interpreting an insurance policy under Pennsylvania law is to
'ascertain the intent of the parties as manifested by the
language of the written instrument.'" Id, 814 F.3d at 676(quoting
Am. Auto. Ins. Co. v. Murray, 658 F.3d 311, 320 (3d Cir. 2011)).
See also, Duda v. Standard Insurance Co., No. 15-2302, 649 Fed.
Appx. 230, 238-239, 2016 U.S. App. LEXIS 8602 (3d Cir. May 10,
2016)("Pennsylvania case law dictates that the proper focus for
determining issues of insurance coverage is the reasonable
expectations of the insured and in most cases, the language of
the insurance policy will provide the best indication of the
content of the parties' reasonable expectations.") "In
performing the foregoing analysis, the court must evaluate the
terms of the policy to determine whether they are ambiguous."
Devcon, supra,(citing Lucker Mfg. v. Home Ins. Co., 23 F.3d 808,

814 (3d Cir. 1994)).  A court must read the policy "as a whole
and construe it according to the plain meaning of its terms."
Ramara, 814 F.3d at 677(quoting C.H. Heist Caribe Corp. v. Am.
Home Assurance Co., 640 F.2d 479, 481 (3d Cir. 1981)).  A court
construes commonly used words and phrases in their natural,
plain, and ordinary sense, with the court free to consult a
dictionary to inform its understanding of terms.  Id.;
Brotherhood Mutual Insurance Co. v. Salem Baptist Church of
Jenkintown, 985 F. Supp. 2d 624, 629 (E.D. Pa. 2013).  If the
court finds that the policy is unambiguous, it must give effect
to the terms as stated on the face of the policy.  Devcon, supra.
But if those terms are open to more than one interpretation, they
are regarded as ambiguous.  Ramara, 814 F.3d at 677 (citing Med.
Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir. 1999)).
"Ambiguous provisions in an insurance policy must be construed
against the insurer and in favor of the insured; any reasonable
interpretation offered by the insured, therefore must control."
Id.; Regent Insurance Co. v. Strausser Enterprises, 902 F. Supp.
2d 628636 (E.D. Pa. 2012).

Once a showing has been made that the complaint has alleged
facts which potentially fall within the scope of an insurance
policy, "the burden then shifts to the insurer to demonstrate
that an exclusion places the particular harm outside of the
policy's reach," bearing in mind that "[e]xclusions from coverage

are strictly construed against the insurer." Devcon, supra. Accordingly, it seems clear that an insurer must defend its insured until it becomes absolutely clear that there is no longer a possibility that the insurer owes its insured a defense or until it is clear that an exclusion may be properly applied. Ramara, 814 F.3d at 663-664; Devcon, at 218.

In the case at hand, Plaintiff naturally asserts that its policy does not provide coverage for the claims which are being advanced against Hall/Hallstone by Hulko and Fair in the Bucks County Court of Common Pleas. Defendants rejoin that because the Halls/Hallstone never received a copy of their Frederick Mutual policy nor was it ever explained to them, Plaintiff is precluded from relying on the exclusions from coverage contained therein.

To begin, we first observe that while the claims in the underlying action are captioned as negligence and breach of warranty, the gravamen of the Hulko/Fair Complaint is Hallstone's alleged defective workmanship in the performance of the stonework at their home. In reading the Frederick Mutual policy as a whole and the exclusions in particular, we agree that defective workmanship is not a covered loss. To be sure, Nos. 5 and 6 of the **ADDITIONAL EXCLUSIONS THAT APPLY ONLY TO PROPERTY DAMAGE** makes this clear insofar as they provide, in pertinent part, that Frederick Mutual does not pay for property damage to that specific part of real property on which the insured or a

contractor or subcontractor is performing work on the insured's

behalf "if the 'property damage' arises out of such work," and

does not pay for property damage to that specific part of any

property "that must be restored, repaired, or replaced because of

faults in [the insured's] work."  The policy also contains an

endorsement (AP 0689) which amends the commercial liability

coverage to exclude coverage for, *inter alia*,

> "...any loss, cost, or expense arising out of any request,
> demand, or order that any "insured" or others test for,
> monitor, clean up, remove, contain, treat, detoxify,
> neutralize, or in any way respond to or assess the effects
> of:
>
>     a.   wet rot; dry rot; a bacterium; a fungus, including
>           but not limited to mildew and mold; or a protist,
>           including but not limited to algae and slime mold;
>           or
>
>     b.   a chemical, matter, or a compound produced or
>           released by wet rot, dry rot, a bacterium, a
>           fungus, or a protist, including but not limited to
>           toxins, spores, fragments, and metabolites such as
>           microbial volatile organic compounds.

This does not end the inquiry, however.  As the Third

Circuit has observed, "Pennsylvania law recognizes and protects

the reasonable expectations of the insured 'regardless of the

ambiguity, or lack thereof, inherent in a given set of insurance

documents' where policy terms may not be readily understandable,

or to protect the insured from deception or unilateral changes to

policy terms by the insurer."  <u>Auto-Owners Insurance Co. v.

Stevens & Ricci, Inc.</u>, 835 F.3d 388, 404, n. 21 (3d Cir.

2016)(quoting <u>Tonkovic v. State Farm Mutual Automobile Insurance

Co., 513 Pa. 445, 521 A.2d 920, 925-926 (1987) and Collister v. Nationwide Life Insurance Co., 479 Pa. 579, 388 A.2d 1346, 1353 (1978)).  This is not to say that policy terms and/or exclusions will not be enforced against an insured who either does not read or comprehend the meaning of those terms or exclusions.  To the contrary, while noting that there may be occasions when courts are justified in deviating from the plain language of insurance contracts, the Pennsylvania Supreme Court has held that "where a policy limitation relied upon by an insurer to deny coverage is clearly worded and conspicuously displayed, the insured may not avoid the consequences of that limitation by proof that he failed to read the limitation or did not understand it."  Standard Venetian Blind, supra, 469 A.2d at 567(overruling Hionis v. Northern Mutual Insurance Co., 230 Pa. Super. 511, 327 A.2d 363 (1974)).

However,  "[i]n the reasonable expectations analysis, the insurer must demonstrate that the insured did not have a reasonable expectation of coverage."  West v. Lincoln Benefit Life Co., 509 F.3d 160, 1471 (3d Cir. 2007).  Courts must therefore examine the dynamics of the insurance transaction to ascertain what are the reasonable expectations of the consumer. Michael v. Stock, 2017 PA Super 99, 162 A.3d 465, 478 (2017). Where the insurer or its agent has created in the insured a reasonable expectation of coverage, even the most clearly-written

exclusion will not bind the insured.  <u>Liberty Mutual Insurance</u>

<u>Co. v. Treesdale, Inc.</u>, 418 F.3d 330, 344 (3d Cir. 2005)(citing

<u>Reliance v. Moessner</u>, 121 F.3d at 903).  And as the Court in

<u>Tonkovic</u> made clear: "Where ... an individual applies and prepays

for specific insurance coverage, the insurer may not unilaterally

change the coverage provided without an affirmative showing that

the insured was notified of, and understood, the change,

regardless of whether the insured read the policy."  <u>Tonkovic</u>,

521 A.2d at 925.

Here, it is clear from the evidence produced at trial that

in 2005, Mr. Hall went to the Fraser Agency and asked them to

place insurance for his stone masonry business.  In doing so, he

asked Mr. Rumbold for $1 million/$2 million "soup to nuts"

coverage, which he believed meant that he would be covered for

"everything under the policy," such that if his business "did

something and somebody made a claim against [his] business" that

he "might be liable for," he "would be covered."  (N.T. 4/24/17,

54-56).  When he signed up for the policy and tendered a check

for the premium, Mr. Hall was given a one-page document, which he

believed was called a "dec page."  (N.T. 4/24/17, 56).

It is also apparent from the trial record that in the

writing of the policies, Frederick Mutual had no direct contact

at all with Mr. Hall/Hallstone.  Rather, Frederick Mutual only

wrote the policies at issue after it had been contacted by its

agency and informed that it had a client who was seeking masons/ artisans coverage. (N.T. 4/24/17, 25-26). From his contact with Mr. Hall, Mr. Rumbold understood that Mr. Hall was a masonry contractor who had several employees and who was looking for general liability insurance in the amount of $1 million/$2 million. (N.T. 4/24/17, 47-52). Based upon this information, Mr. Rumbold completed an insurance application for Hallstone and submitted that application and a down payment to Frederick Mutual with the expectation that all future billings and communications, including transmittal of the policy itself, would be between Frederick Mutual and Mr. Hall directly. (N.T. 4/24/17, 52-53). Frederick Mutual's representative testified that the Policy issued by it to Hallstone and which was first effective on September 27, 2005[1] was an artisan contractor's policy providing general liability insurance coverage for the policyholder and containing the same basic exclusions as any other commercial general liability policy on the market at that time. (N.T. 4/24/17, 5-7). Although it was purportedly the company's policy in 2005 - 2008 to mail copies of newly-issued policies to the insurance agencies which had placed them, there is no evidence on this record that this policy was followed in this case as both Mr. Fraser and Mr. Rumbold testified that Frederick Mutual, like

---

[1] This policy was identical to the policy which Frederick Mutual issued to Hallstone effective August 2007 - February 2008 (N.T. 4/24/17, 6, 10-11).

nearly all of the other companies for whom they wrote policies, directly mailed insurance policies and premium billings to the insureds themselves.  (N.T. 4/24/17, 31-33, 40-42).  Thus it is apparent that at no time did Mr. Hall ever receive a copy of the full insurance policy, which was 64 pages in length and contained the exclusions upon which the plaintiff relies to disclaim coverage, from either the Fraser Insurance Agency or Frederick Mutual.  (N.T. 4/24/17, 56-58).  Mr. Hall therefore never had the opportunity to read the policy provisions and exclusions and, since Mr. Rumbold testified that he never reviewed the policy with him, there is no evidence that he was notified of or that he understood the terms, conditions and exclusions contained therein. (4/24/17, 40-41, 43-45).

Inasmuch as under Pennsylvania law it is the insurer which bears the burden of demonstrating that the insured did not have a reasonable expectation of coverage and after examining the dynamics and the facts underlying the insurance transaction between these parties, we cannot find that Frederick Mutual has sustained its burden here.  Again, the record reflects that Mr. Hall is a stone mason who, despite apparently having a few employees working for him, is not a particularly sophisticated businessman.  The evidence shows that he went to the Fraser Agency seeking what he thought would be comprehensive liability coverage for the stone/masonry work which he was in the business

of performing.  Although the exclusions contained in the Frederick Mutual policy do, we find, clearly exempt defective workmanship and the type of damages sustained by Messrs. Fair and Hulko from coverage, we cannot give those exclusions effect in this case.  The testimony is un-rebutted that the policy containing those exclusions was never provided to Mr. Hall and that those exclusions were never mentioned or explained.  We therefore cannot find that Mr. Hall's expectation that he was covered for such losses/liability to have been unreasonable.

In keeping with these factual findings, we now enter the following:

## CONCLUSIONS OF LAW

1.  This Court has jurisdiction over the parties and the subject matter of this action under 28 U.S.C. §1332 and 28 U.S.C. §2201.

2.  Defendants Donald and Marie Hall, t/a Hallstone, Inc. had a reasonable expectation that they would be covered under Frederick Mutual Policy No. APP2050248 and under an identical policy issued by Frederick Mutual and effective between August 2007 and February 2008 for the liabilities and/or losses for which they are now being sued by Defendants Hulko and Fair in the Bucks County Court of Common Pleas.

3. Plaintiff Frederick Mutual has failed to demonstrate that Defendants Donald and Marie Hall and Hallstone, Inc. ever

received copies of the policies which Plaintiff issued on their behalf or that they read and/or understood the terms, conditions and exclusions set forth in those policies.

4. Plaintiff Frederick Mutual has further failed to demonstrate that Defendants did not have a reasonable expectation of coverage for the losses sustained by Defendants Hulko and Fair for which the Halls/Hallstone are now subject to suit in the Court of Common Pleas of Bucks County, Pennsylvania.

5. Frederick Mutual's masons/artisans/commercial general liability policy #APP2050248 effective for the policy term 9/27/2005 to 9/27/2006 and between August 2007 and February 2008 affords coverage to Donald and Marie A. Hall, t/a Hallstone, Inc. and/or Hallstone, Inc. for the claims against them in Case No. 2015-01587 in the Court of Common Pleas of Bucks County, Pennsylvania, captioned as <u>R. Lee Hulko and Bradley B. Fair v. Donald Hall and Marie A. Hall, husband and wife, Individually and trading as Hallstone</u>.

6. Because there is coverage for the Halls/Hallstone, Frederick Mutual has the duty to defend and, if appropriate, to indemnify them for any and all damages which may be awarded in the above-captioned civil action up to the limits of liability established under the policies at issue here.

An Order of Judgment follows.